UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHARLIE CONNER,

        Plaintiff,

    v.

THE BOARD OF TRUSTEES FOR THE
UNIVERSITY OF ILLINOIS,

        Defendant

No. 19 CV 846

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

Plaintiff Charlie Conner worked as a foreman in the motor pool garage at the University of Illinois, Chicago campus. In December 2015, Conner, who is black, settled a lawsuit against the university alleging that Conner had experienced racial harassment, discrimination, and retaliation while working in the garage. Conner now alleges that his supervisors and coworkers continued to harass and discriminate against him, and he continued to complain about that treatment. In response, the university denied him overtime, denied him adequate support as a foreman, excessively monitored and scrutinized his work, and allowed a culture of racial harassment to pervade the garage. Conner brings claims of retaliation and disparate treatment under Title VII of the Civil Rights Act of 1964 and the Illinois Civil Rights Act. The university moves to dismiss Conner's claim, arguing that it is duplicative of a pending action in the Central District of Illinois and that it fails to state a claim under Federal Rule of Civil Procedure 12(b)(6). Alternatively, the university moves to strike certain allegations for a variety of reasons. For the reasons discussed below,

the university's motion to dismiss is granted in part, denied in part, and its motion to strike is denied.

## I.  Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). In reviewing a motion to dismiss, a court must construe all factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Doe v. Columbia Coll. Chicago*, 933 F.3d 849, 854 (7th Cir. 2019) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *Sloan v. Am. Brain Tumor Ass'n*, 901 F.3d 891, 893 (7th Cir. 2018). On a 12(b)(6) motion, a court may only consider allegations in the complaint, documents attached to the complaint, documents that are both referred to in the complaint and central to its claims, and information that is subject to proper judicial notice. *Reed v. Palmer*, 906 F.3d 540, 548 (7th Cir. 2018) (citing *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012)).

In the employment-discrimination context, the pleading requirement is minimal. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008) ("[A] plaintiff alleging employment discrimination under Title VII may allege these claims quite generally."). All the plaintiff must include in his complaint is the "'type of discrimination' the plaintiff thought occurred," "by whom," and "when." *Huri v. Office of the Chief Judge of the Circuit Court of Cook Cty.*, 804 F.3d 826, 833 (7th Cir. 2015) (quoting *Swanson v. Citibank, N.A.*, 614 F.3d 400, 405 (7th Cir. 2010)); *see also Samovsky v. Nordstrom, Inc.*, 619 Fed. App'x 547, 548 (7th Cir. 2015) ("'I was turned

down for a job because of my race' is all a complaint has to say." (quoting *Tamayo*, 526 F.3d at 1084)). That is because employers are "familiar with discrimination claims and know how to investigate them." *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 827 (7th Cir. 2014). Thus, little information is required "to put the employer on notice of these claims." *Id.*

## II. Facts

Plaintiff Charlie Conner worked in the motor pool garage of the Chicago campus of the University of Illinois, first as a mechanic and later as a foreman. [9] ¶¶ 3–5 (amended complaint).[1] Sometime between 2012 and 2015, Conner sued the university for racial harassment, discrimination, and retaliation. [9] ¶ 27. In December 2015, Conner and the university settled. [9] ¶ 27. Following the settlement, Conner was supposed to meet with two university administrators on a monthly basis. [9] ¶¶ 43, 79. Though the administrators often canceled the meetings, Conner met with them sporadically starting in 2016. [9] ¶¶ 79–80.

In late 2015, the university promoted Conner to foreman of the garage. After Conner's promotion, several of his white coworkers resigned or transferred. [9] ¶ 61. According to one coworker, the employees transferred because they "did not want to work for a black guy." [9] ¶ 61. The university never replaced those workers, so Conner continued to work both as a mechanic and as a foreman. [9] ¶¶ 75–76. Before Conner became foreman, a white man had that job, and the garage was always fully

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings.

staffed with mechanics. [9] ¶ 74. Conner complained to university administrators about being short-staffed. [9] ¶¶ 75–76. They responded that Conner was a "working foreman." [9] ¶¶ 75–76.

Also around the time of Conner's promotion, the garage changed its overtime procedures. The garage's supervisors were required to assign overtime on a rotating basis and historically kept a list of assigned shifts to ensure that they distributed it equally. [9] ¶¶ 68, 70. After Conner's promotion, his supervisors began assigning overtime to every worker except Conner, the only black employee in the garage and the only employee who had complained about racial discrimination. [9] ¶¶ 68–69. In the winter, the garage scheduled overtime in advance because of anticipated snowstorms. [9] ¶ 71. Even when Conner was scheduled in advance to work an overtime shift, a white worker would later replace him on the schedule. [9] ¶ 71. Conner complained to his supervisors that he was being denied overtime shifts. [9] ¶ 69. He also complained to university administrators that his supervisors were discriminating against him by denying him overtime; one administrator responded that Conner cost the university too much when he worked overtime. [9] ¶ 70. The university continues to deny Conner overtime. [9] ¶ [73].

During an early 2016 meeting with administrators and a supervisor, Conner broke down in tears describing the conditions in the garage. [9] ¶ 83. Following the meeting, the supervisor told Conner's coworkers that he had cried during the meeting and accused Conner of putting on a "big show." [9] ¶ 84. Around the middle of 2016, Conner told university administrators that the racial issues in the garage would

persist so long as many of the supervisors there had a history of racial discrimination. [9] ¶ 81.

In July 2016, Conner's former supervisor Jim McNamara, who worked in a different university garage after Conner's lawsuit, sped toward Conner in his car as if to hit him. [9] ¶¶ 35–36. Conner told his current supervisor, Bob Witas, what had happened, and Witas said he would talk to McNamara. [9] ¶ 36. In September, McNamara again almost hit Conner with his car. [9] ¶ 36. After Conner reported the second incident, Witas told Conner that he had not gotten around to speaking with McNamara yet, and that Conner should kick McNamara's car when McNamara tried to hit him again. [9] ¶ 37. In February 2017, McNamara sped toward Conner, and Conner jumped out of the way onto the hood of another car. [9] ¶ 39. Conner reported the incident to Witas, the university police, and Chicago police, who arrested McNamara. [9] ¶¶ 40–41. Following that incident, Conner met with university administrators and told them that he had reported McNamara's previous threats to Witas. [9] ¶ 43.

In early 2018, another supervisor pressured Conner to release a vehicle before Conner had finished inspecting it. When Conner refused, the supervisor told Conner to "do [his] fuckin[g] job." [9] ¶ 53. The supervisor did not pressure or use profane language toward other workers in the garage. [9] ¶ 54. Conner filed a written summary of that incident to Facilities Management. [9] ¶ 55. University administrators subsequently interviewed Conner's supervisor about the incident but

took no action; Conner later learned that a different supervisor had told the administrators that Conner had been the one who had used profanity. [9] ¶¶ 55–56.

One of Conner's supervisors excessively monitored Conner's work and frequently told Conner to "shut up." [9] ¶ 64. He regularly made disparaging comments about black employees' work product, especially in front of white employees. [9] ¶ 64. Another supervisor frequently cursed at, yelled at, and condescended to Conner [9] ¶ 65. Neither supervisor disparaged, cursed at, or excessively monitored the work of white workers or workers who had not complained about discrimination in the past. [9] ¶¶ 64–65.

Conner's supervisors and coworkers directed racial slurs and epithets at him two to three times per month from 2016 into 2019. [9] ¶¶ 30–31. For example, in late 2017, a supervisor told Conner that he looked like "black Aunt Jemima" because he was wearing a winter hat. [9] ¶ 47. In early 2018, a different supervisor had a disagreement with another black employee. [9] ¶ 52. Shortly afterward, the supervisor asked Conner, "Are all black people this ignorant?" [9] ¶ 52. In spring 2018, a supervisor commented that "[a]ny monkey can do this job" and then added, "let me rephrase, any jack-leg mechanic can do this." [9] ¶ 48. On several occasions, that supervisor told Conner that he was "killing the [u]niversity." [9] ¶ 59. One coworker used the "N" word around Conner once every three or four weeks into 2018. [9] ¶ 62. Coworkers called Conner a "white hater" and told him, "this is not over" in the context of his complaints about racism. [9] ¶¶ 58, 60. And another coworker

frequently joked that things should be fixed the "white" way when he meant the "right" way. [9] ¶ 62.

## III.    Analysis

Conner alleges that the university violated Title VII and the Illinois Civil Rights Act by retaliating against him for repeatedly complaining about racial discrimination and harassment in the motor pool garage. He also claims that the university treated him differently than white employees because of his race. The university moves to dismiss Conner's complaint, arguing that the complaint is duplicative of a pending class action in the Central District of Illinois, Conner released some of his claims by his 2015 settlement with the university, and Conner has failed to state a case of either retaliation or disparate treatment. It also moves to strike allegations it labels "conclusory," irrelevant, untruthful, and salacious, as well as allegations that relate solely to a claim of hostile work environment.[2]

### A.    Duplicative Lawsuits

A federal suit may be dismissed when it is "duplicative of a parallel action already pending in another federal court." *Serlin v. Arthur Andersen & Co.*, 3 F.3d 221, 223 (7th Cir. 1993) (quoting *Ridge Gold Standard Liquors, Inc., v. Joseph E. Seagram & Sons, Inc.*, 572 F. Supp. 1210, 1213 (N.D. Ill. 1983)). A suit is duplicative if the "claims, parties, and available relief do not significantly differ" between the two

---

[2] In Conner's original complaint, [1], filed in February 2019, he brought hostile-work-environment claims under Title VII and ICRA, in addition to claims of retaliation and disparate treatment. In April, he amended his complaint to remove the hostile-work-environment claims. [9].

lawsuits. *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 889 (7th Cir. 2012) (quoting *Ridge Gold*, 572 F. Supp. at 1213).

The university urges dismissal of Conner's complaint as a matter of judicial economy, because both Conner's case in this court and the Central District class action seek relief under the same statutes, and, according to the university, both complaints allege similar facts.

The parties, claims, and relief sought all differ between Conner's complaint and the class action.[3] Conner is not a named plaintiff in the class action. The court in that case has not certified a class yet, so Conner is not actually a party to the class action. *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 593 (2013) (a nonnamed class member is not a party to class-action litigation before the class is certified). The claims in the two complaints are also different. Here, Conner brings claims of retaliation and disparate treatment; the class action brings hostile-work-environment claims on behalf of the named plaintiffs and the proposed classes, and retaliation and disparate-treatment claims only on behalf of the named plaintiffs individually. [15-3] ¶¶ 488–523. And the two cases seek different relief. Conner's complaint requests, among other things, compensatory damages for emotional distress and lost wages. The class action seeks compensatory damages and lost wages, but it also requests punitive damages and an injunction requiring the university to

---

[3] I take judicial notice of the class-action complaint. *Miller v. City of Monona*, 784 F.3d 1113, 1117 (7th Cir. 2015) (courts may take judicial notice of "court records"); *see Daniel v. Cook County*, 833 F.3d 728, 742 (7th Cir. 2016) ("Courts routinely take judicial notice of … the contents of filings in other courts.").

implement new policies, training, and disciplinary measures. [15-3] ¶¶ 526–35 (prayer for relief).

Finally, though the university insists that the two suits "arise out of the same material facts," [15] at 7, there is little factual overlap. The university identifies only five paragraphs in Conner's complaint (out of 60 factual allegations) that the class-action plaintiffs also included in their complaint. Likewise, the class-action complaint contains only 21 paragraphs that detail Conner's experiences, out of nearly 450 factual allegations. [15-3] ¶¶ 181–202. The class-action complaint includes only three examples that also appear in Conner's complaint: when a supervisor asked Conner if "all black people [are] this ignorant," when that supervisor told Conner to "do [his] fuckin[g] job," and when another supervisor used the word "monkey." [15-3] ¶¶ 186, 188–90, 202.

I am not persuaded that this is a case of deliberate claim-splitting and gamesmanship. As Conner points out, the rule against claim-splitting generally does not apply to class actions. *Valentine v. WideOpen W. Fin., LLC*, 288 F.R.D. 407, 415 (N.D. Ill. 2012); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 256 F.R.D. 586, 597 (N.D. Ill. 2009) That is because class actions "inherently involve the representation of unnamed class members in abstentia and without notice," so the types of claims and relief available in a class action are limited. *Valentine*, 288 F.R.D. at 415; *Makor Issues*, 256 F.R.D. at 597 (comparing a class action to "an action in a court of limited jurisdiction" because only certain claims and forms of relief are available (quoting 18 *Moore's Federal Practice* § 131.40[3][e][iii] (2002))). Parties are thus free to "pursue

separately" claims that could not be adjudicated within the class action, even when they "arise from the same nucleus of operative facts." *Valentine*, 288 F.R.D. at 415. That's what Conner did here, and his complaint does not warrant dismissal or transfer. *Cf. McReynolds*, 694 F.3d at 889 (finding district court properly dismissed complaint where named plaintiffs in two cases were the same, and plaintiff could obtain "complete relief" in earlier-filed case); *Serlin*, 3 F.3d at 223 (same, where parties and remedies were the same in both cases).

## B. The Retaliation Claim

The university argues that Conner has failed to state a claim of either retaliation or disparate treatment. Title VII prohibits an employer from discriminating against an employee who has opposed an employment practice that the statute prohibits. 42 U.S.C § 2000e–3(a); *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792–93 (7th Cir. 2007). To state a claim for retaliation, a plaintiff must allege: (1) he engaged in a protected activity; (2) he suffered an adverse employment action; and (3) that there is a causal link between the two. *Alamo v. Bliss*, 864 F.3d 541, 555 (7th Cir. 2017); *Huri*, 804 F.3d at 833. The university contends that Conner has failed to sufficiently plead any of those three elements.

### 1. Protected Activity

A "'cognizable expression of opposition' to discriminatory practices" qualifies as protected activity. *Jaburek v. Foxx*, 813 F.3d 626, 633 (7th Cir. 2016) (quoting *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 634 (7th Cir. 2011)). For example, filing a charge of discrimination with the EEOC is protected activity. *See Poullard v.*

*McDonald*, 829 F.3d 844, 856 (7th Cir. 2016); *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006); *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 533 (7th Cir. 2003) (holding there was "no dispute" that plaintiff satisfied the element of protected activity "by filing her EEOC charge"). Likewise, "[l]itigating under Title VII is a protected activity." *Flanagan v. Office of the Chief Judge of the Circuit Court of Cook Cty.*, 893 F.3d 372, 375 (7th Cir. 2018).

Beyond litigation, "filing an official complaint with an employer" may constitute protected activity, so long as that complaint alleges that the discrimination occurred "because of sex, race, national origin, or some other protected class." *Tomanovich*, 457 F.3d at 663–64; *see Huri*, 804 F.3d at 833 (finding that plaintiff engaged in protected activity "by filing EEOC charges and making internal complaints"); *Bhat v. Accenture LLP*, 473 Fed. App'x 504, 507 (7th Cir. 2012) ("[I]nternal complaints may constitute statutorily protected activity."). And even an informal or verbal complaint may qualify as protected activity. *Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 674 (7th Cir. 2011) (finding "informal comments" to a supervisor to be "within the scope of protected activity").

The university argues that Conner's complaint makes only vague, generic assertions of protected activity. I disagree. Conner's complaint details several occasions on which he reported continuing racial discrimination, beginning with his 2015 lawsuit, which is itself protected activity. He also pursued several internal complaints to his supervisors or to other university officials, including that he: reported to supervisors and administrators that a former supervisor tried to hit

Conner with a car in reaction to Conner's lawsuit, [9] ¶¶ 36–37, 43; submitted a written incident report about his supervisor cursing at him, [9] ¶ 55; complained to supervisors and administrators about discrimination in the denial of overtime, [9] ¶¶ 69–70; and repeatedly notified administrators of "persisting racial issues" in the garage. [9] ¶¶ 80, 83. It is somewhat unclear from the complaint whether every one of these complaints was about race-based discrimination and not more general complaints about Conner's working conditions. But at the very least, his 2015 lawsuit was based on race discrimination, and he alleges that he specifically tied his complaint about being denied overtime to his status as the only black employee on the shift. That is enough at this stage, so Conner has adequately stated that he engaged in protected activity.

### 2.    *Materially Adverse Employment Action*

Generally, adverse employment actions fall into three categories: termination or reduction in compensation "or other financial terms of employment"; changes in job duties that "cause an employee's skills to atrophy and reduce future career prospects"; and "unbearable changes in job conditions, such as a hostile work environment." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 980 (7th Cir. 2014) (quoting *Barton v. Zimmer, Inc.*, 662 F.3d 448, 453–54 (7th Cir. 2011)). In a retaliation claim, a materially adverse employment action need not affect "the terms and conditions of employment," but it must be an action "that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity.'" *Poullard*, 829 F.3d at 856 (quoting *Roney v. Ill.*

12

*Dep't of Transportation*, 474 F.3d 455, 461 (7th Cir. 2007)); *Henry v. Milwaukee County*, 539 F.3d 573, 586 (7th Cir. 2008). The range of conduct prohibited in the retaliation context is broader than in the antidiscrimination context. *Alamo*, 864 F.3d at 555 n.39.

The university argues that Conner has failed to plead that it subjected him to any materially adverse employment action. Conner identifies three such actions: denying him overtime, denying him adequate support as a foreman, and subjecting him to retaliatory harassment in the form of racial slurs and physical threats.

### a. Denial of Overtime

Whether the denial of overtime constitutes a materially adverse employment action is fact-specific. If overtime is "a significant and expected part of an employee's annual earnings," withholding it may be an adverse employment action. *Formella v. Brennan*, 817 F.3d 503, 511 (7th Cir. 2016); *Lewis v. City of Chicago*, 496 F.3d 645, 653 (7th Cir. 2007). In contrast, when extra pay is in the employer's discretion and only awarded sporadically, it is not an adverse employment action. *Lewis*, 496 F.3d at 653; *see also Ziccarelli v. Dart*, 581 Fed. App'x 563, 566 (7th Cir. 2014); *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 979 (7th Cir. 2004).

Here, it is plausible that overtime was a consistent and expected part of Conner's compensation such that its denial could constitute a materially adverse employment action. Conner alleges that overtime was distributed on a regular basis. Particularly in the winter, Conner's supervisors assumed that operation of the garage would require overtime work and set a schedule for it in advance. That the garage

was understaffed also suggests that overtime was a necessary tool to keep operations running smoothly. These facts support the reasonable inference that overtime was not distributed sporadically, but was a relied-upon, expected financial component of working in the garage. Drawing all inferences in Conner's favor, he has sufficiently alleged that the denial of overtime was an adverse employment action.

The university argues that Conner's allegation of overtime denial is time-barred, and thus cannot serve as an adverse employment action. A Title VII plaintiff must file a charge with the EEOC either 180 days or 300 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e–5(e)(1); *see Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 104–05 (2002). Each "discrete discriminatory act starts a new clock for filing charges alleging that act." *Morgan*, 536 U.S. at 113. Here, Conner filed his charge with the EEOC on July 19, 2018. [9] ¶ 23. So, to be actionable, any discrete discriminatory or retaliatory acts must have taken place after September 22, 2017.

At the pleading stage, however, "a complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations." *Cancer Found., Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d 671, 674–75 (7th Cir. 2009). Thus, district courts "ordinarily should not dismiss a complaint based on an affirmative defense" such as untimeliness. *Parungao v. Cmty. Health Sys., Inc.*, 858 F.3d 452, 457 (7th Cir. 2017); *see also Chi. Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610 613–14 (7th Cir. 2014). In order to warrant dismissal based on untimeliness, the plaintiff must "affirmatively plead himself out of court"; in other words, the complaint must

"plainly reveal" that the "action is untimely." *Chi. Bldg. Design*, 770 F.3d at 614 (quoting *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005)).

Conner's claim is not plainly untimely. While the university correctly observes that Conner links the denial of overtime to his promotion in late 2015, [9] ¶ 70, the complaint also states that the university continued to deny him overtime into the relevant EEOC period and up to the filing of this lawsuit. *See* [9] ¶ 73 (Conner "continues to be denied overtime."). Conner should anticipate that the timeliness of his claim will be an issue, but at this stage of the case, Conner has sufficiently pleaded that he was denied overtime during the relevant time.

### b. Failure to Support

The university's failure to replace mechanics after Conner assumed foreman duties was not a materially adverse employment action. While it may have been frustrating for Conner to remain responsible for some mechanic duties, the university's refusal to hire replacement mechanics did not rise to the level of an employment action that would dissuade another employee from complaining about discrimination. The lack of replacement employees did not affect Conner's compensation or financial status, cause his skills to decline, preclude him from future job opportunities, or change his working environment in a way that amounted to severe harassment or mistreatment. I agree with the university that Conner has failed to plead that denial of adequate support was an adverse employment action.

### c. Retaliatory Harassment

"Harassment can constitute a materially adverse action for retaliation purposes." *Poullard*, 829 F.3d at 857; *Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 745 (7th Cir. 2002); *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 466 (7th Cir. 2002). The harassment must be "actionable harassment—severe or pervasive" to be considered an adverse employment action. *Hilt-Dyson*, 282 F.3d at 466; *see also Herrnreiter*, 315 F.3d at 745 (harassment must be "sufficiently severe to worsen substantially" an employee's "conditions of employment").

Conner's allegations state a sufficiently severe form of harassment. His supervisors and coworkers subjected him to a litany of racially charged comments. What's more, Conner's supervisors singled him out for disparagement and criticism, often in front of other employees. And Conner's supervisors and coworkers openly blamed him for complaining about discrimination and harassment in the motor pool—a supervisor repeatedly told Conner that he was "killing the university," another supervisor mocked Conner for crying during a meeting in which he was discussing racial harassment, and another employee warned him, "this is not over." McNamara, Conner's former supervisor, tried to hit him with a car three times, beginning shortly after Conner settled his lawsuit against the university. Conner has sufficiently pleaded that these recurring threats of physical assault and racial harassment materially changed his working conditions. It's plausible that this barrage of harassment was significant enough to dissuade a reasonable employee from complaining about discrimination.[4] *See Huri*, 804 F.3d at 833 (finding that

---

[4] The university points out that some of the allegations of harassment are undated and may have occurred outside the relevant 300-day period. As noted above, untimeliness is an

plaintiff sufficiently pleaded an adverse employment action for retaliation claim based on a "litany of malfeasance," including screaming, exclusion from social functions, and denial of time off, among others).

### 3.    *Causation*

To prevail on a retaliation claim, the plaintiff must show that the protected activity was a but-for cause of the adverse action. *Carlson*, 758 F.3d at 828 n.1. In other words, the adverse action "would not have happened without the activity." *Id.* A close temporal relationship between the protected activity and the retaliatory act can support an inference of a causal link but will "rarely" suffice to establish causation. *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 565 (7th Cir. 2015) (quoting *O'Leary*, 657 F.3d at 635).

In the university's view, Conner fails to establish any pattern linking sporadic harassing comments to retaliation for his complaints of race-based discrimination. But *Carlson* is instructive here. 758 F.3d at 829. Parsing the events in the complaint in a way that loses sight of the bigger picture is not appropriate at the motion-to-dismiss stage. *See id.* Conner alleges that he complained about racial discrimination multiple times between late 2015 until 2019, and the university denied him overtime and subjected him to harassment on a recurring basis over that same period. Based on the allegations in Conner's complaint, it is plausible that Conner experienced an "ongoing pattern of retaliation," *id.*, which supports an inference of causation.

---

affirmative defense and Conner's complaint does not establish that all acts of harassment necessarily occurred before the 300-day mark.

Conner has alleged a temporal relationship between at least his first lawsuit and some of the adverse employment actions. That lawsuit settled in December 2015. Conner alleges that the university began denying him overtime after his promotion to foreman in late 2015, which would have been around the same time his first lawsuit settled, supporting an inference that the university began denying him overtime because of his lawsuit. And even if Conner released retaliation claims that had accrued at the time of the settlement, Conner alleges that the university subjected him to racially charged comments with some frequency beginning in 2016, after his first lawsuit settled, but close enough in time to suggest a connection to the lawsuit.

Beyond temporal proximity, Conner's supervisors and coworkers often directly stated that they were harassing him because he had complained about racism. For example, they told him that he was "killing the university" with his complaints, warned, "this is not over," and called him a "white hater," all comments that apparently referred to Conner's ongoing complaints of racism in the garage. These frank admissions from Conner's coworkers that they were harassing him in response to his complaints of racism further support the inference of causation.

Finally, Conner's complaint alleges that the university treated Conner differently than other workers, not only because he was the only black employee on his shift, but because he was the only employee with a history of protected activity. For example, Conner alleges that his supervisors never disparaged, cursed at, excessively monitored, or withheld overtime from employees who had not complained

about past racism. These facts, too, support an inference that the university retaliated against Conner because he had complained about racial discrimination.

Conner may proceed on his retaliation claim under the theories that the denial of overtime and retaliatory harassment constituted adverse employment actions. The scope of his claim (i.e., its timeliness) and whether some or all of it was released by settlement require factual development before those issues can be resolved. "Release of a claim is an affirmative defense." *ADM All. Nutrition, Inc. v. SGA Pharm Lab, Inc.*, 877 F.3d 742, 745 (7th Cir. 2017); *United States v. Rogers Cartage Co.*, 794 F.3d 854, 860 (7th Cir. 2015). Thus, release is not a hurdle that Conner is required to overcome at this stage of the case. *See Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.*, 782 F.3d 922, 928 (7th Cir. 2015). And the complaint does not plead all the facts establishing the defense—it is plausible that acts of retaliation occurred after the settlement but in response to the protected activity of the 2015 lawsuit and other complaints of discrimination.

### C. The Disparate-Treatment Claim

To establish a claim of disparate treatment under Title VII, a plaintiff must allege "that an employer took job-related action against him which was motivated by intentional discrimination." *Alamo*, 864 F.3d at 552; *see* 42 U.S.C. § 2000e–2(a)(1). A plaintiff may prove intentional discrimination either directly or indirectly. *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). At the pleading stage, however, a plaintiff need not plead elements of a prima-facie case under the indirect method. *Carlson*, 758 F.3d at 830.

The university argues that Conner has failed to plead that he suffered any materially adverse employment action and that similarly situated white workers were treated more favorably.

An adverse employment action is a "heavier burden" in a discrimination claim under § 2000e–(2)(a) than in a retaliation claim under § 2000e–(3)(a). *Huri*, 804 F.3d at 833 n.3; *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 648 (7th Cir. 2005). While retaliation may take "many forms," discrimination claims are limited to employment actions that affect the employee's "compensation, terms, conditions, or privileges of employment." *Whittaker*, 424 F.3d at 648 (quoting *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 660 (7th Cir. 2005)). An adverse employment action in a discrimination claim must be "a significant change in employment status." *Huri*, 804 F.3d at 833 n.3.

Conner alleges that the university inflicted three adverse employment actions on him that it did not impose on his white counterparts: denying him overtime, excessively supervising him, and denying him adequate support as a foreman. For the reasons stated above, it is plausible that the university denying Conner overtime was an adverse employment action (within the limitations period). Even in the discrimination context, where the plaintiff's burden is heavier, denial of overtime can affect a plaintiff's compensation. *Formella*, 817 F.3d at 511; *Lewis*, 496 F.3d at 653. But, as discussed above, Conner has not pleaded that the university's failure to adequately support him as a foreman constituted a materially adverse employment action.

Conner has also failed to state that excessive monitoring, standing alone, was an adverse employment action. Excessive scrutiny, while it may be irksome, is not a "significant" change in employment status or working conditions. *See, e.g.*, *Threatt v. Donovan*, 380 Fed. App'x 544, 548 (7th Cir. 2010) (upholding summary judgment for employer who "excessively scrutinized" plaintiff's work because that action did not "significantly alter[] the terms and conditions of employment" or result in any "tangible job consequence"); *see also Smith v. Sebelius*, 484 Fed. App'x 38, 42 (7th Cir. 2012) (same, in retaliation claim).

Finally, a plaintiff "is not required to identify similarly situated comparators" at the pleading stage. *Carlson*, 758 F.3d at 830; *see also Freeman v. Metro. Water Reclamation Dist. of Greater Chi.*, 927 F.3d 961, 965 (7th Cir. 2019) (finding plaintiff's failure to plead "comparable coworkers" in discrimination claim "not fatal" at pleading stage). And in any event, Conner's claim alleges that he was the only black employee on his shift in the garage, and that every employee but him—and specifically white employees—received the opportunity to work overtime. Those facts suffice at this stage of the case.

Conner's disparate-treatment claim based on the denial of overtime survives the university's motion to dismiss.

### D.     The University's Motion to Strike

The university also moves under Federal Rule of Civil Procedure 12(f) to strike all of the allegations in Conner's complaint that it labels conclusory, misleading, untruthful, or salacious; it also seeks to strike allegations that it argues Conner

released by his 2015 settlement or that relate to the hostile-work-environment claim that Conner removed from the amended complaint. That motion is denied in its entirety.

A court may—but is not required to—strike allegations from a pleading that are "redundant, immaterial, impertinent, or scandalous." Fed. R. Civ. P. 12(f). Motions to strike are generally disfavored. *Olson v. McGinnis*, 986 F.2d 1424 (7th Cir. 1993); *Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1294 (7th Cir. 1989) (motions to strike "potentially serve only to delay"). And allegations may be stricken as scandalous only if they "bear[] no possible relation to the controversy or may cause the objecting party prejudice." *Talbot v. Robert Matthews Distrib. Co.*, 961 F.2d 654, 664 (7th Cir. 1992).

Here, the university fails to show that it has suffered any harm or prejudice from Conner's allegations in the pleadings. None of the allegations the university takes issue with threaten to prolong or delay Conner's case. That Conner alleges a fact does not mean he is entitled to discovery on that fact. And that an allegation may later end up being irrelevant, inadmissible, or even untruthful does not mean that it must be stricken from the pleadings. Finally, regarding the university's argument that some of the allegations in the complaint are time-barred or released, Conner is entitled to use "prior acts as background evidence in support of a timely claim." *Morgan*, 536 U.S. at 113.

A word on the meaning of "conclusory" is in order. The university liberally attaches the label to dozens of allegations in Conner's complaint. But conclusory

statements are "bare legal conclusions, not facts." *Adams v. City of Indianapolis*, 742 F.3d 720, 733 (7th Cir. 2014). Many of the allegations the university identifies as "conclusory" are concrete examples of comments made to Conner, actions that his supervisors took, who Conner notified in order to address a given incident or action, the contents of those conversations, and the outcome that occurred as a result. In other words, they are specific factual allegations, and should be treated that way. *See Carlson*, 758 F.3d at 829–30 (noting that the district court improperly dismissed as "conclusory" a complaint that included "specific examples of poor treatment").

## IV. Conclusion

Defendant's motion to strike and dismiss [15] is granted in part, denied in part. Conner's retaliation and disparate-treatment claims based on denial of adequate support as a foreman are dismissed. His disparate-treatment claim based on excessive scrutiny is dismissed. His retaliation and disparate-treatment claims alleging denial of overtime and the retaliation claim alleging retaliatory harassment are not dismissed. No allegations are stricken. Defendant shall answer the complaint by October 29, 2019.   A status hearing is set for November 8, 2019 at 9:30 a.m.

ENTER:

Manish S. Shah
United States District Judge

Date:  October 15, 2019